**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

INTERNATIONAL LONGSHOREMEN'S     \*
ASSOCIATION, LOCAL 333
1104 Hull Street                 \*
Baltimore, Maryland 21230,
                                 \*
and
                                 \*
RIKER J. MCKENZIE, JR.
6639 Dogwood Road                \*     Civil Action No.: 1:15-cv-813
Gwynn Oak, Maryland 21207,
                                 \*
and
                                 \*
EZEKIEL GIVENS
4700 Amberley Avenue             \*
Baltimore, Maryland 21229,
                                 \*
and
                                 \*
AVON  M. ALLISON
500 N. Rock Glen Road            \*
Baltimore, Maryland 21229,
                                 \*
and
                                 \*
DERRICK ARTER
2707 Uhler Ave                   \*
Baltimore, Maryland 21215,
                                 \*
and
                                 \*
JAMES ANDERSON
5729 Onnen Road, Apt. D          \*
Baltimore, Maryland 21206,
                                 \*
and
                                 \*
RASUL A. AQUIL
9206 Liberty Road                \*
Randallstown, Maryland 21133,
                                 \*
and
                                 \*

- 1 -

ANDRE BENNETT                          *
1307 Pentridge Road
Baltimore, Maryland 21239,              *

and                                     *

STANLEY BERRY                           *
1312 E. Monument Street
Baltimore, Maryland 21205,              *

and                                     *

ALBERT JASON BOYD                       *
3900 Taylor Avenue
Baltimore, Maryland 21236,              *

and                                     *

GARY D. BREWINGTON                      *
3665 Chesterfield Avenue
Baltimore, Maryland 21213,              *

and                                     *

PAUL J. BRISCOE                         *
1075 Cameron Road
Baltimore, Maryland 21212,              *

and                                     *

KENNARD BROWN                           *
109 W. Henrietta Street
Baltimore, Maryland 21230,              *

and                                     *

QUANTA BROWN                            *
933 Fordwood Court
Baltimore, Maryland 21228,              *

and                                     *

MOAB BROWN-BEY                          *
818 N Linwood Ave
Baltimore, Maryland 21205,              *

and                                              *

GARY KENNETH BURRELL                             *
1541 Burnwood Road
Baltimore, Maryland 21239,                        *

and                                              *

SHERMAN CANNON                                   *
1603 E. Eager Street, Apt. 303
Baltimore, Maryland 21205,                        *

and                                              *

JEROME CARTER                                    *
1612 E. Oliver Street
Baltimore, Maryland 21213,                        *

and                                              *

STACY M. CHASE                                   *
730 McKewin Avenue
Baltimore, Maryland 21218,                        *

and                                              *

CHRISTOPHER COLBERT                              *
4300 Carleview Road
Baltimore, Maryland 21207,                        *

and                                              *

CARYN J. CONYERS                                 *
3423 Milford Mill Road
Windsor Mill, Maryland 21244,                     *

and                                              *

ANTIONE CRAWFORD                                 *
1732 Homestead Street
Baltimore, Maryland 21218,                        *

and                                              *

                                                 *

BARRY CULMER, JR.                    *
1548 Winford Road
Baltimore, Maryland 21239,           *

and                                  *

RICHARD DANIEL                       *
715 Streeper Street
Baltimore, Maryland 21205,           *

and                                  *

PRENTICE DENNIS                      *
3841 Twin Lake Court
Baltimore, Maryland 21244,           *

and                                  *

CHRISTOPHER DUNNOCK                  *
2627 Mura Street
Baltimore, Maryland 21213            *

and                                  *

ERIC DUVALL, SR.                     *
1269 Gittings Avenue
Baltimore, Maryland 21239,           *

and                                  *

ERIC DUVALL, JR.                     *
1269 Gittings Avenue
Baltimore, Maryland 21239,           *

and                                  *

JOHN D. EATON                        *
1825 W. Mosher Street
Baltimore, Maryland 21217,           *

and                                  *

KEITH FERGUSON                       *
2824 West Coldspring Lane
Baltimore, Maryland 21215,           *

and                                                    *

DAMON FLEARLY, SR.                                     *
423 Yale Avenue
Baltimore, Maryland 21229,                             *

and                                                    *

ERIKA GAINES                                           *
1330 W. Lombard Street, Unit B
Baltimore, Maryland 21223,                             *

and                                                    *

TODD A. GALLOWAY                                       *
2308 Arunah Avenue
Baltimore, Maryland 21216,                             *

and                                                    *

NATHAN GILMER                                          *
4769 Homesdale Avenue
Baltimore, Maryland 21206,                             *

and                                                    *

SCOTT L. GIVENS                                        *
11 Little Brook Court
Windsor Mill, Maryland 21244                           *

and                                                    *

AMANDA GRAVES                                          *
1304 Halstead Road
Parkville, Maryland 21234,                             *

and                                                    *

JOSEPH  B. GREEN, JR.                                  *
2400 Hermosa Avenue
Baltimore, Maryland 21214,                             *

and                                                    *

                                                       *

TEION HAIRSTON                                    *
809 Newington Avenue, Apt. B
Baltimore, Maryland 21217,                        *

and                                               *

TAAVON HALL                                       *
1530 Shields Place
Baltimore, Maryland 21217,                        *

and                                               *

KEASHA HANNAH                                     *
3136 N. Rolling Road
Baltimore, Maryland 21244,                        *

and                                               *

JOSEPH A. HARDEN, IV                              *
6617 Mt. Vernon Avenue
Baltimore, Maryland 21215,                        *

and                                               *

DIANE HIBLER                                      *
7218 Waldman Avenue
Sparrows Point, Maryland 21219,                   *

and                                               *

DOMENIQUE HOLDEN                                  *
4462 Kentford Road
Owings Mills, Maryland 21117,                     *

and                                               *

SHAWN JACKSON                                     *
7936 Henslowe Court
Pasadena, Maryland 21122,                         *

and                                               *

CARL LEE JOHNSON, JR.                             *
3512 Elmora Avenue
Baltimore, Maryland 21213,                        *

and
                                                *
CHARLES JOHNSON
4405 Berger Avenue                              *
Baltimore, Maryland 21206,
                                                *
and
                                                *
MARIO JOHNSON, JR.
5500 Greenhill Avenue                           *
Baltimore, Maryland 21206,
                                                *
and
                                                *
MAURICE JOHNSON
4503 Homer Avenue                               *
Baltimore, Maryland 21215,
                                                *
and
                                                *
CALVIN E. JONES
P.O. Box 66656                                  *
Baltimore, Maryland 21239,
                                                *
and
                                                *
GEORGE JONES
5904 Waycross Road                              *
Baltimore, Maryland 21206,
                                                *
and
                                                *
WAYNE JONES
3674 Chesterfield Avenue                        *
Baltimore, Maryland 21213,
                                                *
and
                                                *
PARKER RAY KEY
3509 Meadowdale Drive                           *
Baltimore, Maryland 21244,
                                                *
and
                                                *

                                                *

STEVEN KNIGHT
2911 Oakley Avenue                       *
Baltimore, Maryland 21215,
                                         *

and
                                         *

MARCEL LARKINS
3326 Clarks Lane, Apt F                  *
Baltimore, Maryland 21215,
                                         *

and
                                         *

CHARMAINE V. LITTLE
3738 Ellerslie Avenue                    *
Baltimore, Maryland 21218,
                                         *

and
                                         *

DERICK LITTLE
3309 Kentucky Avenue                     *
Baltimore, Maryland 21213,
                                         *

and
                                         *

EUGENE N. LITTLE
2445 N. Calvert Street                   *
Baltimore, Maryland 21218,
                                         *

and
                                         *

TERRY LONG
903 Chase Court                          *
Bel Air, Maryland 21014,
                                         *

and
                                         *

RODNEY K. MARTIN
3406 Chesterfield Avenue                 *
Baltimore, Maryland 21213,
                                         *

and
                                         *

JAMES LAMONT MCNAIR
4360 Nicholas Avenue                     *
Baltimore, Maryland 21206,
                                         *

and                                              *

STEVEN B. MILLER, SR.                            *
5133 Spring Willow Court
Owings Mills, Maryland 21117,                    *

and                                              *

WALTER C. MOORE                                  *
217 Evans Street
Glen Burnie, Maryland 21060,                     *

and                                              *

ANWAR MUHAMMAD                                   *
1907 Ramblewood Road
Baltimore, Maryland 21239,                       *

and                                              *

DANA MUNDELL                                     *
5410 Summerfield Avenue
Baltimore, Maryland 21206,                        *

and                                              *

GREGORY JEROME MURRAY                            *
3514 Brendan Avenue
Baltimore, Maryland 21213,                        *

and                                              *

KEVIN MYRICK                                     *
500 Bayside Drive
Baltimore, Maryland 21222,                        *

and                                              *

CHARLES NELSON, JR.                              *
3415 Teresa Court
Baltimore, Maryland 21213,                        *

and                                              *

                                                 *

NATHANIEL L. PRYOR, JR.          *
2737 Brendan Avenue
Baltimore, Maryland 21213,        *

and                               *

TRYONE E. QUEEN, SR.             *
3209 Dudley Avenue
Baltimore, Maryland 21213,        *

and                               *

EMANUEL Q. REED                  *
3487 Hillsmere Road
Baltimore, Maryland 21207,        *

and                               *

ALISHA RHODES                    *
3614 Elmley Avenue
Baltimore, Maryland 21213,        *

and                               *

MARCUS RICHARDSON                *
1 Babybird Court
Baltimore, Maryland 21227,        *

and                               *

MAURICE SHERROD                  *
6302 Tramore Road
Baltimore, Maryland 21214,        *

and                               *

VON A. SIMON                     *
5812 Halwyn Street
Baltimore, Maryland 21212,        *

and                               *

EVERETT J. SMITH                 *
1320 Middleford Road
Catonsville, Maryland 21228,      *

and                                                    *

RANDOLPH SMITH                                         *
2817 Rona Road
Baltimore, Maryland 21207,                             *

and                                                    *

ANDREW SMITHSON, SR.                                   *
3201 Northway Drive
Baltimore, Maryland 21234,                             *

and                                                    *

BOBBY SYDNOR                                           *
2110 Pennsylvania Avenue
Baltimore, Maryland 21217,                             *

and                                                    *

KELLY TOREZ TALBERT                                    *
3627 Columbus Drive
Baltimore, Maryland 21215,                             *

and                                                    *

ALLEN R. TAYLOR                                        *
5321 Nelson Avenue
Baltimore, Maryland 21215,                             *

and                                                    *

DELVIN THOMPSON                                        *
630 Maurice Street
York, Pennsylvania 17404,                              *

and                                                    *

KEVIN TUCKER                                           *
719 Gnome Court
Glen Burnie, Maryland 21061,                           *

and                                                    *

                                                       *

HAYWARD WALLACE                            *
242 Woodrow Lane
Port Deposit, Maryland 21904,              *

and                                       *

PHILLIP WEST                              *
3209 Westmont Avenue
Baltimore, Maryland 21216,                *

and                                       *

FREDERICK WHITE                          *
1206 Four Winds Way
Essex, Maryland 21221,                    *

and                                       *

DANTE WILLIAMS                           *
1627 Hakesley Place
Baltimore, Maryland 21213,                *

and                                       *

HARRISON WILLIAMS                        *
4724 Wakefield Road, Apt. 303
Baltimore, Maryland 21216,                *

and                                       *

REGINALD JEROME WILSON                   *
2611 W. Belvedere Avenue, Apt. TA
Baltimore, Maryland 21215,                *

and                                       *

RANDY WRIGHT                             *
2 Nutmeg Knoll Court, Apt. F
Cockeysville, Maryland 21030,             *

        *Plaintiffs*,        *

v.                                        *

            *

INTERNATIONAL LONGSHOREMEN
ASSOCIATION, AFL-CIO                          *
5000 West Side Avenue, Suite 100
North Bergen, New Jersey 07047                *

     *Serve On:*                          *
     Harold J. Daggett, President
     5000 West Side Avenue                *
     North Bergen, New Jersey 07047
                         *

and                                           *

HAROLD J. DAGGETT
5000 West Side Avenue                         *
North Bergen, New Jersey 07047
                         *

and                                           *

BENNY HOLLAND, Jr.
914 Clear Lake City Boulevard                 *
Webster, Texas 77598-6604,
                         *

and                                           *

STEPHEN KNOTT
5000 West Side Avenue                         *
North Bergen, New Jersey 07047,
                         *

and                                           *

GERALD OWENS
5000 West Side Avenue                         *
North Bergen, New Jersey 07047,
                         *

and                                           *

JOHN D. BAKER
591 Erieside Avenue                           *
Cleveland, Ohio 44114,
                         *

and                                           *

STEAMSHIP TRADE ASSOCIATION
OF BALTIMORE, INC.,                           *
8615 Ridgely's Choice Drive, Suite 202
Nottingham, Maryland 21236                    *

*Serve on Resident Agent:*          *
Michael J. Collins, Esq.
Thomas & Libowitz, P.A.              *
7104 Biter Lane
Highland, Maryland 20777             *

*Defendants.*                       *

  *    *    *    *    *    *    *    *    *    *    *    *    *

## PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND

### INTRODUCTION

1.      This lawsuit arises from the actions of the International Longshoremen's Association – some taken independently, and some taken in concert with the multi-employer association Steamship Trade Association of Baltimore, Inc. – which have unlawfully deprived Plaintiffs of their respective statutorily mandated union-related and civil rights.

2.      Plaintiffs bring this lawsuit to redress three different sets of actions that are sufficiently discrete to give rise to three different causes of action, yet related in their underlying genesis and motivations.

3.      In Count I of the Complaint, Plaintiffs contest the International Longshoremen Association's wrongful imposition of a Trusteeship over ILA Local 333, and the concomitant removal of the Local's officers, in violation of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 401, *et. seq*.

4.      In Count II of the Complaint, Plaintiffs contest the International Longshoremen's Association's unlawful refusal to recognize recently admitted members of ILA Local 333, despite their having satisfied all of the criteria for membership, as set forth in the International Longshoremen's Association's own Constitution.   The International Longshoremen's Association's actions breaching the express terms of its Constitution constitutes a breach of contract actionable under Section 301 of the Labor-Management Relations Act, 29 U.S.C. §185.

- 14 -

5.      In Count III of the Complaint, Plaintiffs seek redress for the regular, continuing and institutionalized acts of racial discrimination that the International Longshoremen's Association and the Steamship Trade Association of Baltimore, Inc., acting independently and in concert, continue to commit in violation of this Court's Order and Consent Decree issued in 1971 by Judge Alexander Harvey to eradicate discrimination in and by the ILA and the STA, and over which this Court retained continuing jurisdiction (the "Judge Harvey Decree").

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over all of Plaintiffs' claims pursuant to 28 U.S.C. § 1331, as all claims arise under federal law.

7.      Specifically, Count I is brought pursuant to the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 401-531. (hereinafter, the "LMRDA") and the jurisdiction expressly granted in § 102 (29 U.S.C. §412) and §304(a) (29 U.S.C. §464(a)) of the Act, and pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

8.      The Court's jurisdiction over Count II arises pursuant to the Labor-Management Relations Act of 1947, 29 U.S.C. §185.

9.      Count III relies upon the continuing jurisdiction of this Court based upon the terms of an Order and Consent Decree issued pursuant thereto by this Court by Judge Alexander Harvey, II, in *United States v. International Longshoremen's Assoc.*, Civil Action No.: 20688 (decision and Order reported at 319 F.Supp. 737 (D.Md. 1970)).  The Consent Decree expressly provided that,

> This Court shall retain jurisdiction of this matter, with full power and authority to alter, amend, add to or delete any provision found not to be in the interest of justice and equity, or to issue any additional orders as becomes necessary to insure equal employment opportunities are provided to all member and non-member referral candidates, or applicants therefor without regards to race or color.

(Exh. 1, attached.)

10.     Venue is proper in this Court under 28 U.S.C. §1391(b)(2) inasmuch as the causes of action have arisen primarily within Baltimore, Maryland.

PARTIES

11.     Plaintiff International Longshoremen's Association Local No. 333 ("Local 333," or, the "Local") is an unincorporated association and is affiliated with Defendant International Longshoremen's Association, AFL-CIO. The principal office of Plaintiff Local 333 is located at 1104 Hull Street, Baltimore, Maryland.  At all times relevant hereto, Plaintiff Local 333 was the certified collective bargaining representative of the bargaining unit consisting of certain longshoremen employed by members of Defendant Steamship Trade Association of Baltimore, Inc. who work in the Port of Baltimore.

12.     Plaintiff Riker J. McKenzie ("Mr. McKenzie") is a member of Local 333 and was the elected President of the Local until International Longshoremen's Association President Harold Daggett removed him on November 26, 2014, and imposed a temporary Trusteeship over the Local.  Mr. McKenzie is a resident of the State of Maryland.

13.     Plaintiff Ezekiel Givens ("Mr. Givens") is a member of Local 333 and was the elected Recording Secretary of the Local until being removed by International Longshoremen's Association President Harold Daggett on November 26, 2014, when Mr. Daggett imposed a temporary Trusteeship over the Local.  Mr. Givens is a resident of the State of Maryland.

14.      The Plaintiffs identified on Exhibit 2 attached hereto (the "New Member Plaintiffs"), are individuals who applied for membership in Local 333 and, having met all of the criteria for membership under the International Longshoremen's Association Constitution, were

properly processed and sworn in to Local 333 union membership in August or September 2014. All of the New Member Plaintiffs are residents of the State of Maryland.

15.    Defendant International Longshoremen's Association, AFL-CIO (the "International," or, "ILA") is an unincorporated labor organization representing employees in an industry affecting commerce within the meaning of section 3(i) and (j) of the LMRDA (29 U.S.C.A. § 402(i) and (j)), and as defined in Sections 501(1) and (3), and 2(5), of the LMRA, 29 U.S.C. § 142(1) and (3), and §152(5), and within the meaning of Section 301 of the LMRA, 29 U.S.C. § 185.  The International is the parent organization with which Plaintiff Local 333 is affiliated.  The authorized agents of Defendant International are currently conducting the affairs of Local 333 through the Trusteeship imposed on November 26, 2014.

16.    Defendant Harold J. Daggett ("Mr. Daggett") is the President of Defendant International and a member of its Executive Council.  Mr. Daggett imposed the temporary Trusteeship over Local 333 on November 26, 2014, and appointed a regular Trustee over Local 333 on February 27, 2015.

17.    Defendant Benny Holland, Jr. ("Mr. Holland") is the Executive Vice President of Defendant International and a member of its Executive Council.

18.    Defendant Stephen Knott ("Mr. Knott") is the General Vice President of Defendant International and a member of its Executive Council.

19.    Defendant Gerald Owens ("Mr. Owens") is the General Organizer of Defendant International and a member of its Executive Council.

20.    John D. Baker ("Mr. Baker") is the Assistant General Organizer of Defendant International and a member of its Executive Council.

21.     The ILA and Messrs. Daggett, Holland, Knott, Owens, and Baker may hereafter be referred to collectively as the "Union Defendants."  The International Officers named as Defendants above are responsible for usurping the authority of Local 333 and its duly elected officers, and taking actions which have destroyed the democratic process to which Local 333 members are entitled by law, including but not limited to the removal of the Executive Board of Local 333, the imposition of a temporary Trusteeship, the subsequent imposition of a formal Trusteeship over Local 333, and other actions involved in wrongfully usurping the authority of the Local and its members and operating the affairs of Plaintiff Local 333 in a blatantly undemocratic and authoritarian manner.  Defendants are present, either directly or through representatives, and have engaged in these activities within this District continually since November 26, 2014.

22.     Defendant Steamship Trade Association of Baltimore, Inc. ("STA," or, the "Employer"), is a Maryland corporation, having its principal place of business at 8615 Ridgely's Choice Drive, Suite 202, Nottingham, Maryland 21236, within the jurisdiction of this Court. Defendant STA is a multi-employer association representing employers in the Port of Baltimore.

**FACTUAL BACKGROUND**

23.     Defendant ILA is a venerable organization, with a history that dates back over 100 years.  According to its web site, the ILA represents more than 65,000 longshoremen in the United States and Puerto Rico.

24.     Defendant ILA also is an organization, however, that relies heavily on exercising tight control over the operations of its local unions to achieve the International's internal agenda. The ILA is prepared at any time to implement a bare-fisted approach to reign in any local union – or individual – that has the audacity to take any position that conflicts with the International's

- 18 -

internal preferences, even which such positions are lawful, principled, and in the best interests of the membership of the Local.

25.     The racial composition of the leadership of Defendant ILA is predominantly white, notwithstanding the fact that there are many members of locals throughout the United States who are African American.  In addition, there are some locals, like Local 333, which are composed predominantly of persons of color.   Yet, the ILA's Executive Council is predominantly white, including its President (Mr. Daggett), Executive Vice President (Mr. Holland), General Vice President (Mr. Knott), and Assistant General Organizer (John D. Baker). This racial composition has been true historically as well.

26.     The International is organized into two distinct geographic districts – the Atlantic Coast District (ACD), and the South Atlantic Gulf Coast District (SAGCD).  The President of the ACD is Dennis Daggett, the son of International President Daggett.  Dennis Daggett is white. The President of the SAGCD is Clyde Fitzgerald.  He is white as well.

27.     The International President, Mr. Daggett, has the authority to appoint 27 International Vice Presidents to represent the ILA in its various jurisdictions.  Twenty-three (23) of the 27 International Vice Presidents are white.

28.     At the Port of Baltimore, the ILA has chartered three local unions in addition to Local 333 -- Locals 1429, 2066, and 953.  Both the membership and leadership of all three of those locals are overwhelmingly white as well.  They may be as high as 98% white even though two-thirds of the City of Baltimore, the home for most union members working in the Port, is African American.

29.     Local 333 is the only ILA Local in Baltimore that consists of a majority of African American members, and which has, at least since the Judge Harvey Decree, been governed by an Executive Board consisting primarily of African Americans.

30.     Mr. McKenzie, also known as "Rocky" McKenzie, is an outspoken African American man who is well-known to the International.  Mr. McKenzie has worked in the industry for more than 40 years, having first started working as a longshoreman on December 8, 1970.

31.     Mr. McKenzie has been speaking up for the rights of Local 333's rank and file members for decades, beginning his union leadership activities in 1985.  And the International has been targeting Mr. McKenzie for his principled positions on behalf of Local 333's membership since Mr. McKenzie first spoke out at the National ILA Convention in 1987 and raised the ire of the International leadership.

32.     The rank and file members of Local 333 enthusiastically support Mr. McKenzie's unadulterated, unswayable commitment to protecting their rights and best interests.  They elected Mr. McKenzie to be Vice President of Local 333 in 1987, to the Executive Board in 2006, and to the Presidency of Local 333 in 2008.

33.     Nevertheless, the International has continually thwarted the desire of the Local 333 members.  The ILA has twice targeted Mr. McKenzie for removal.  It first removed him as Local 333 President in August 2010.  Mr. McKenzie ran again for President of the Local in December 2010 and received an overwhelming majority of votes in a secret ballot against his opponent, winning 348 to 175.  Despite his winning the election with two-thirds of the vote, the International refused to recognize Mr. McKenzie's re-election and disqualified him from

consideration.  Instead, the International installed Mr. McKenzie's defeated opponent as Local 333 President.

34.     At the next Local 333 election held in December 2012, the membership again overwhelmingly elected Mr. McKenzie as President of Local 333.

35.     Mr. McKenzie has continued to advocate strongly for the interests of Local 333 members.  He has consistently challenged the International's penchant for back door cooperation with the STA, which cooperation often is patently detrimental to the members of Local 333. Most recently, the International has conspired with the STA and members of Local 333 who oppose Mr. McKenzie and who are happy to negotiate "sweetheart" deals with the STA and/or the ILA.  Such sweetheart deals may be in the collective bargaining agreement or they may be in a side agreement.  These deals are designed to benefit the STA, not Local 333.  On the contrary, these deals have now and will continue to decimate the rights and potentially even the existence of Local 333.  Unable to deter Mr. McKenzie from his full-throated advocacy for the rights of Local 333, the International has now chosen once again to silence Mr. McKenzie by removing him from office.

36.     This time, the International used the excuse of the complaint of a single white member (who also was an opponent of Mr. McKenzie in the election of officers) as the basis for removing Mr. McKenzie and placing Local 333 into Trusteeship, thereby eliminating the only obstacle between the International and the pursuit of its self-serving agenda.  The narrative used by the ILA is built upon the feigned impropriety of Local 333's admission of approximately 500 new members in August and September of 2014.  This narrative was clearly manufactured by the ILA for the sole purpose of removing Mr. McKenzie before an impending vote on a new collective bargaining agreement could be held. The proposed agreement would, among other

things, integrate side agreements negotiated between the STA and certain Local 333 members who have been willing to act with reckless disregard for the rights of the majority of Local 333 members in order to advance their own agenda, an agenda driven in part by racial discrimination.

37.     The feint failed.  On February 13, 2015, a vote was held on a contract proposal developed, promoted, and supported by the Internationally-run, Trustee leadership. Among other things the contract proposal offered under the International's imposed temporary Trusteeship would roll back gains made by the Local years ago.  The proposal was overwhelmingly rejected by the Local's members.

38.     Moreover, the manner in which the Trustee conducted the vote – as well as the union meeting that the Trustee conducted just two days before on February 11, 2015 -- ran roughshod over the democratic procedures that must be followed for these critical events.  The Trustee's egregious violations of democratic procedures are set forth in further detail below.  By way of a single example, however, the Trustee held both the union meeting on February 11, 2015, and the actual vote on February 13, 2015, in the intimidating environment of the Employer's terminal, rather than at the Union Hall, where these events always are held.  Not only did this location violate the Local Bylaws' requirement that the vote for a collective bargaining agreement be called in the "usual and customary manner," but also this location prevented access to Local members who do not possess the government-issued identification documents that are necessary to gain access to the terminal.

39.     In an act that demonstrated how blatantly detrimental the proposed contract was to the interests of the Local 333 members, despite the efforts of the International to control the meeting and voting procedures to assure passage, the proposed contract was resoundingly defeated by the membership.

40.     Having controlled every aspect of the vote on the contract proposal, the International presumably had met its stated purpose for imposing the temporary Trusteeship in the first place, which was to "prepar[e] an up-to-date membership list of individuals who are eligible to vote in both the contract ratification vote and in the election."  Despite having met its stated objective, the International did not remove the temporary Trusteeship.  Rather, the International Trusteeship Committee issued its decision the very next day after the vote, February 14, 2015, to make the temporary Trusteeship over Local 333 permanent.

41.     The International's actions in removing the Local 333 Executive Board and imposing a Trusteeship to allegedly restore democratic procedures is a manufactured justification aimed once again at silencing Mr. McKenzie and other African American leaders of Local 333, and opening the door to allow the International to preserve its self-serving agenda.  The imposition of this Trusteeship constitutes a violation of the LMRDA, 29 U.S.C. §§ 401-531.

42.     The Plaintiff New Members were lawfully admitted to Local 333, in accordance with the membership requirements of the ILA Constitution and the Local 333 Constitution and Bylaws.

43.     The blatant refusal of the ILA to acknowledge these new members constitutes a breach of the ILA's Constitution and gives rise to a breach of contract action under Section 301 of the LMRA, 29 U.S.C. §185.

44.     The ILA's and STA's joint efforts to prevent the advancement of African Americans in terms of seniority, advancement to top paying and more secure positions, training, and work opportunities, has become endemic in the Port of Baltimore, in blatant violation of the landscape of equal opportunity that Judge Harvey envisioned and sought to establish through the Judge Harvey Decree.

45.     The causes of action arising from the continuing racial discrimination by the ILA and the STA are further supported by the facts set forth below.

### FACTS COMMON TO ALL COUNTS

46.     The allegations contained in Paragraphs 1 through 45 are incorporated by reference as if fully set forth herein.

47.     The ILA Constitution clearly sets forth the criteria for admission to membership in the ILA:

> Any worker who is employed or seeks employment in a trade, industry or occupation within the jurisdiction of the I.L.A. shall be eligible to apply for membership and shall be admitted to membership without regard to race, age, sex, citizenship, or ethnic origin thirty (30) days after application unless just cause can be shown for rejection of the application.  Locals are permitted to establish additional requirements for membership so long as these requests comply with applicable law.

ILA Constitution, Article XIV, Section 2.  These are the very standards relied upon by Mr. Daggett in his directive to Mr. McKenzie ordering the admission of Messrs. Knight and Pirog, as described in Paragraph 51 below.

48.     Beginning in October 2011, following a directive approved by a vote of the membership, Local 333 advertised for new members.  The Local distributed 1,500 applications and interviewed approximately 700 applicants.

49.     At different times following the acceptance of these applications, Local 333 processed various groups of the new applicants and admitted them as members of Local 333 without protest or intervention by the International or the membership of Local 333.  These applicants were processed and admitted as members of Local 333 in precisely the same way as new applicants had been processed and admitted for many years before.  The ILA and those who seek to undermine Mr. McKenzie's leadership have cited a provision in the Local 333 Bylaws

which requires an affirmative vote of the entire membership of the Local to approve the admission of new members.  This provision has never been applied in connection with the admission of new Local 333 members -- no vote of members has ever been required to admit new persons into Local 333.  The provision has been de facto rejected and disregarded by the Local.

50.     On November 19, 2013, Defendant Daggett, acting pursuant to his authority as President of the International, wrote a letter to the Executive Board of Local 333 regarding two individuals who had applied for membership in Local 333, Patrick McKnight and Daniel Pirog. Mr. Daggett wrote:

> I have received correspondence from Patrick McKnight and Daniel Pirog, Sr. regarding their multiple failed attempts to join Local 333's membership.  As you know, Article XIV, Section 2 of the ILA Constitution requires a local union to admit to membership any individual working or seeking work at the craft covered by the local union unless just cause can be shown for rejecting that individual's application.  Inasmuch as both of these individuals appear to have been working at the craft covered by Local 333, they must be admitted to membership unless there is just cause to reject their application.

51.     On July 2, 2014, Mr. Daggett again wrote to the Local 333 Executive Board, enclosing a copy of his November 19, 2013 letter in which he had (according to Mr. Daggett's own characterization) "directed Local 333 to admit Daniel Pirog into membership."  Having learned that Mr. Pirog still had not been admitted, Mr. Daggett now commanded, "Accordingly, with [sic] 21 days from the date of this letter, please admit him to membership or inform me as to the good cause that prevents his admission."

52.     On July 10, 2014, Plaintiff Mr. McKenzie, acting in his role as ILA Vice President, responded to Mr. Daggett's July 2, 2014 letter.  Mr. McKenzie first acknowledged his understanding of Mr. Daggett's position that any individual who meets the ILA Constitutional requirements for membership must be admitted into Local 333:

> I am in receipt of your recent letter dated July 2, 2014. I have advised Local 333 that according to Article XIV, Section 2 of the ILA Constitution that they are required, and directed by you, through me, that any individuals that are: 'Employed or seek employment in [ILA Local 333's jurisdiction] shall be eligible to apply for membership and shall be admitted to membership . . . thirty (30) days after application.

53.     Thereafter in his July 10, 2014 letter, Mr. McKenzie advised Mr. Daggett that the consequences of Mr. Daggett's directive would be to compel the admission of all other applicants for Union membership who meet the criteria of the ILA Constitution, writing:

> Please be advised, other individuals have proof they have worked or sought work in Local 333's jurisdiction, and Local 333 will admit them into membership along with prior applicants that are already being processed into union membership.  I have reviewed this understanding of how to proceed with [International legal counsel] Andrew Mazzola and believe this course should meet your directive.  We have set August 22, 2014 as a deadline for this process.  Should you have any additional concerns, please contact me at your earliest convenience.

Mr. Daggett did not raise any concerns in response to Mr. McKenzie's letter.

54.     As expressly stated in Mr. McKenzie's July 10, 2014 letter to Mr. Daggett, in August 2014, Local 333 began to process for admission all applicants for Union membership who met the ILA Constitution's criteria for admission.  Specifically, the Executive Board admitted all individuals: (i) who had been working or seeking work in the industry, (ii) who had submitted an application; (iii) whose application had been made at least 30 days earlier; and (iv) for whom there was no just cause to deny admission.  Approximately 500 applicants who met these criteria were processed and were sworn in to membership of Local 333.  All newly admitted members (the "New Members") paid their Initiation Fee and First Quarter Dues.

55.     Thereafter, on September 12, 2014, Mr. Daggett issued another letter to the Local 333 Executive Board, stating that he had received a complaint from a member of Local 333, objecting to the admission of the new members.

56.     The member complaint was a September 4, 2014 letter from Ronald Barkhorn, a perennial nemesis of Mr. McKenzie who makes no effort to mask his own antipathy for Mr. McKenzie.  Mr. Barkhorn not only has filed frequent charges against Mr. McKenzie in the past, but even in his September 4, 2014 letter, Mr. Barkhorn admitted that he had "filed NLRB Charges against Brother McKenzie and his supporters on the Ex. Bd.," and that he "filed internal charges against Brother Mckenzie [sic] and his supporters on the Bd." for reasons unrelated to the admission of these new members.

57.     In his September 4, 2014 complaint, Mr. Barkhorn contended that in November 2012, Local 333 members had decided not to accept any more new members after 100 applicants were selected by lottery.  Therefore, Mr. Barkhorn objected to the recent admission of new members.

58.     Mr. Barkhorn's contention that a prior membership motion barred the admission of new members is false and easily disproved.

59.     Nevertheless, Mr. Daggett seized on this opportunity to initiate a series of events calculated to remove Mr. McKenzie from office and seize control over Local 333.  The events were undertaken by individuals hand-picked by Mr. Daggett to assure the outcome he sought.

60.     On September 15, 2014, Mr. McKenzie responded to Mr. Daggett's September 12, 2014 letter, agreeing to comply with Mr. Daggett's instructions, but imploring Mr. Daggett to send a representative "so we can educate him about eligibility of the applicants and provide demonstrative proof that the representative needs to report to the Committee."  Mr. McKenzie emphasized the need for prompt resolution by October 3, 2014, prior to the Union's regularly scheduled meeting on October 7, 2014.

61.     Instead of accepting Mr. McKenzie's invitation for informal resolution, Mr. Daggett instructed International Vice President Wilbert Rowles ("Mr. Rowles") and ACD Vice President Robert Gladden, Jr. ("Mr. Gladden") to comprise a committee (the "Committee") to conduct a disciplinary hearing against the Local 333 Executive Board on Mr. Barkhorn's "charges."  The hearing was held on September 29, 2014.

62.     The Committee waited almost two months to issue its Committee Report with Findings and Recommendations ("Committee Report"), which was released on November 24, 2014.   The Committee recommended that the approximately 500 new members not be recognized as bona fide members of Local 333.   However, the decision was not based on the complaint of Mr. Barkhorn.   Rather, the Committee opined that the Local 333 Bylaws contain a provision requiring new members to be approved by the Local's members.

63.     The Bylaws provision requiring a vote of the current members to admit new members is one that has never had been implemented.   Not a single member of Local 333 has been required to have his or her initial membership application for Local 333 approved by the general membership as a prerequisite to admission to the Local.   Such an interpretation of the Bylaws would, among other things, impermissibly override the ILA Constitution's mandate that an individual who meets all of the admission criteria of the ILA Constitution cannot be denied membership in the Union except for just cause shown.

64.     Mr. Daggett seized upon the Committee's Report to achieve his primary goal -- to elevate the matter from a disciplinary hearing to one serious enough to impose a Trusteeship over Local 333.   The Trusteeship made it possible to remove the Local's officers.   Rather than have Mr. Rowles simply issue the Committee Report in response to Mr. Barkhorn's charges, which would have terminated the matter, Mr. Daggett used the Committee Report and its

Recommendation as the basis for asserting baseless charges against the Local 333 Executive Board and imposing a Trusteeship.

65.     On November 24, 2014, Mr. Rowles issued a letter to Mr. Daggett (the "Trusteeship Charges") in which he stated that, "this letter and the Committee Report, a copy of which I attach, are to be deemed charges against Local 333 President Rocky McKenzie and the Local 333 Executive Board to determine whether or not a trusteeship should be imposed over Local 333 in accordance with Article XXI, Section 1 of the ILA Constitution to restore democratic procedures."

66.     The Trusteeship Charges consist of seven paragraphs of allegations which aver that the Executive Board violated Local 333's Bylaws when it admitted the New Members without membership approval.  The Trusteeship Charges concluded with the assertion that a Trusteeship must be imposed upon Local 333 in order to restore democratic procedures in the Local.  In addition, the Charges averred that the imposition of the Trusteeship would assure that an accurate membership list would be compiled in anticipation of an upcoming vote on a proposed collective bargaining agreement (the "CBA") and upcoming Local elections for officers.

67.     The Trustee Charges are specious and have no basis in fact. The imposition of a Trusteeship over Local 333 to "restore democratic procedures" was a political ploy designed to achieve the International's goal of changing the Local 333 leadership. The action was wholly unnecessary.  Even if the International's interpretation of Local 333's Bylaws were correct, the matter could have been remedied easily and quickly by simply conducting a membership vote to determine whether the membership approved the admission of the new members.  Instead, as set forth below, the International acted hastily to impose the Trusteeship before a regularly-

scheduled membership meeting – which was scheduled for December 2, 2015 – could be held to address the allegations.

68.     The Trusteeship Charges stated that a Trusteeship was necessary because accurate membership lists were necessary for the upcoming contract vote and Local election, and "[h]aving created the problem, [the current Executive Board members] are not in the position to correct it." This assertion provides no substantive basis for taking the extraordinary action of imposing a Trusteeship. Indeed, it was nothing more than a flimsy excuse for accomplishing the International's unjustified agenda of seizing control over Local 333 in anticipation of a contract vote. The extraordinary action of imposing Trusteeship would enable the International to sideline the Local's outspoken, democratically elected officers, whose interest in contract negotiations was to benefit Local 333's rank and file members, even when those interests were at odds with the preferences of the International.

69.     On November 26, 2014, Mr. Daggett issued the formal directive that he envisioned from the start of this process. Mr. Daggett suspended Local 333's officers, imposed a temporary Trusteeship over Local 333, and appointed Mr. Rowell to be the temporary Trustee and conduct Local 333's affairs.

70.     Significantly, Mr. Daggett instructed the Trustee "to use the services of Ralph Gerchak, former district director of the United States Department of Labor and his office, UnionWatch LLC, to assist in connection with the preparation of an up-to-date membership list of individuals who are eligible to vote in both the contract ratification vote and in the election." The Local 333 Executive Board – which had complied with all International directives – could have performed the same task, utilizing the services of a third party, without the imposition of a Trusteeship over the Local's affairs.

71.     On December 4, 2014, a hearing was held on the Trusteeship Charges purportedly to determine whether the temporary Trusteeship that Mr. Daggett imposed over Local 333 should be continued in order to restore democratic procedures.   Mr. Daggett appointed International Vice Presidents James H. Paylor, Jr. ("Mr. Paylor") and Willie J. Seymore ("Mr. Seymore") as the Chairman and Committeeman, respectively, of a committee (the "Trusteeship Hearing Committee") to conduct the December 4, 2014 hearing.   The proceedings were stenographically recorded, but there is no evidence that a transcript of the proceedings ever was prepared.

72.     The Charged Parties appeared at the hearing and presented testimony and approximately 600 pages of supporting documentation demonstrating that the charge of improperly admitting new members to the Local had no merit.   Nevertheless, the Trusteeship Hearing Committee completely ignored the 600 pages of documentation and other evidence provided by Local 333, while overlooking the International's lack of evidence to support the charges.

73.     At all times relevant to this Lawsuit, all of Local 333's members were employed by employer members of the STA, pursuant to the continuing provisions of a collective bargaining agreement with the STA (the "CBA").   The term of the CBA expired on September 30, 2010, and a new CBA was to be negotiated by the parties.   Upon information and belief, Plaintiffs hereby allege that one of the primary purposes of the International, Mr. Daggett, and the other Defendant International Executive Council members, in imposing the Trusteeship, was to enter into an agreement with the STA which rolled back terms and conditions gained by Local 333 over the years.   A majority of the members of Local 333 strongly opposed this proposed "sweetheart agreement" with the STA.

74.     From their years of experience in the industry and their years of service in leadership positions in Local 333, Mr. McKenzie and Mr. Givens have a strong understanding of the history of collective bargaining between the STA and Local 333.  They are knowledgeable both of the current terms and conditions of employment provided in the expired CBA, as well as modification of the CBA by side agreements many of which are detrimental to the members and which were adopted without member approval.  Messrs. McKenzie and Givens are aware of the history of bargaining in recent years which have deprived members of the bargaining unit of the benefits of the CBA.  They also are fully aware of the expressed concerns and needs of Local 333's member, which concerns and needs Local 333 would seek to address in the new CBA.  Mr. McKenzie and Mr. Givens also have repeatedly demonstrated a willingness to stand up and challenge the International in order to advocate for the best interests of the rank and file members of Local 333.

75.     Therefore, another primary purpose of the Trusteeship was to remove Mr. McKenzie and Mr. Givens from the Executive Board of Local 333.  If these men were removed, they could no longer oppose the International's goals of negotiating a CBA which would be less favorable to the members of Local 333 than the preceding, expired agreement.

76.     Having suspended the Local 333 Executive Board and imposed his hand-picked Trustee, Mr. Daggett – through his Trustee -- proceeded to negotiate a new CBA with the STA. The process that the International employed in negotiating and holding a vote on the contract proposal made a mockery of the existing democratic procedures for this crucial undertaking. Just a few examples of the gross improprieties employed by the International, which reveal the International's ulterior motives of influencing the outcome of the vote, follow.

77.     Local 333 has a democratically elected negotiating team to represent them at the bargaining table, known as the Wage Scale Committee.  However, rather than utilize the Wage Scale Committee to develop proposals and negotiate the new contract on behalf of the Local, the International selected an individual named Scott Cowan to craft contract proposals and negotiate with the STA.  Mr. Cowan was one of the members of the Local 333 Executive Board who had been removed by Mr. Daggett upon imposing the temporary Trusteeship – but now was being brought back to assist in this crucial function.  Mr. Cowan also was the only white member of the Local 333 Executive Committee, and also happened to be the very individual who had expressed his intention to run against Mr. McKenzie in the upcoming Local 333 election of officers.  The International thereby effectively deprived the Local's members of their democratic voice in this process and relied instead on individuals to lead this effort who openly intended to challenge Mr. McKenzie.

78.     The International's decision to suspend all of the members of Local 333's Executive Board – including Mr. Cowan – and then bring back only Mr. Cowan to play a central role on behalf of the Trustee is part of the ILA's strategy for gaining control over Local 333.  Mr. Rowell's charges that caused the imposition of the Trusteeship professed to need "a list of members in good standing who are eligible to vote for local union officers."  In the same way that Mr. Rowell's purported need to develop a membership list to vote for a contract is being used in an attempt to push through an International-crafted contract, the ILA intends to prepare a membership list to vote for officers that will be calculated to ensure Mr. Cowan's election as the ILA's backdoor mechanism for replacing Mr. McKenzie.

79.     The International held a membership meeting on February 11, 2015 – just two days before the vote on the proposed new CBA scheduled for February 13, 2015 -- to discuss the contract proposal.  The meeting, as organized by the International, was a travesty.

80.     Rather than hold the meeting on a Tuesday at the Union Hall, as all membership meetings are held, the International conducted the meeting on a Wednesday evening *at the Employer's terminal*.   Meeting at the Employer's facility has the intention and effect of intimidating Local members and discouraging their attendance.  Moreover, the Port is a federal facility, and government-issued identification is required in order to gain access (such as a TWIC card or MPA card).  Not all Local members have such identification, and by meeting at the Employer's terminal, the International excluded a number of members of Local 333 from attending.  Nevertheless, Maryland Port Authority representative Dave Thomas was present in the building, highlighting the collusive relationship among the ILA, the MPA, and the STA, and further underscoring the International's efforts to intimidate the Local 333 general membership.

81.     The International also did not mail copies of the contract proposal to the Union members in advance of the meeting, as was the longstanding custom, but instead the proposed CBA was distributed for the first time at the meeting.  Tellingly, the proposed CBA already had been signed by the STA and by the Trustee.

82.     The International also did not elect judges at the meeting who would observe the impending vote to assure the fairness of the process.  Electing such judges is the standard procedure by Local 333 for monitoring the fairness of a contract vote.

83.     The proposed CBA itself was a devastatingly bad proposal that would have significantly compromised the best interests of Local 333 and its members in connection with a wide range of issues.

84.     In these and other ways, the International trampled the democratic procedures that apply during the process of developing and negotiating a new CBA to the detriment of Local 333 and its members.

85.     The International conducted a vote on the proposed contract on February 13, 2015.  As with the pre-vote meeting just two days earlier, the International arranged for the vote to take place in the intimidating environment of the Employer's terminal, effectively precluding certain Local members from access.

86.     The International also circulated disinformation about the vote, creating the false impression among some Local members that the vote was not taking place on that day, although in fact it was.

87.     The International selected four individuals from Local 333 to act as observers of the vote.  Three of the four individuals were white.  The single black individual selected was a former Executive Board member who was opposed to Mr. McKenzie.

88.     The International also placed representatives from the International at strategic locations in the voting area in extremely close proximity to the ballot box.  The physical area where the vote was held was miniscule, increasing the sense of intimidation created by the International representatives.  In addition, the International permitted the International's legal counsel to be present during the vote, and performed the vote using numbered ballots rather than standard, unmarked ballots that would have permitted members to vote with assured anonymity.

89.     Despite the International's efforts to achieve its desired outcome, the Local 333 membership resoundingly rejected the International's contract proposal.  Approximately 447 members voted against the contract proposal, and approximately 172 voted in favor of it.

90.     As set forth above, the primary stated purpose of imposing the Trusteeship was to assure that a membership list would be compiled that would meet with the International's unarticulated and mysterious criteria for accuracy.   As of February 13, 2015, when the International conducted the contract, the International presumably was satisfied that its membership list was accurate.   Presumably, now that the ILA's stated objective of the Trusteeship had been achieved, the ILA could now dissolve the Trusteeship.

91.     The International, however, did not remove the Trusteeship following the vote. On the contrary, on February 14, 2015 – the very day after the vote was held -- the Trusteeship Hearing Committee issued its formal Report and Recommendations of Trusteeship Hearing Committee for ILA Local 333 (the "Report"), recommending that the temporary Trusteeship be continued.   This continuation of the Trusteeship without justification provides further evidence of the disingenuous rationale of the ILA.

92.     The Report issued by the Trusteeship Hearing Committee and the recommendations contained therein are fundamentally flawed.   Among other things, the Report completely ignored the definitive evidence presented by the Charged Parties exonerating them of the charges.   Even in the absence of any rebuttal of that evidence; it failed to provide any objective, substantive basis to support the charge that the Charged Parties deprived Local 333 of democracy as required by the LMRDA; it improperly raises and addresses substantive issues not contained in the Trusteeship Charges; and the Report proposes Recommendations that are wholly unrelated to the restoration of democratic procedures—allegedly the issue which was the justification for the Trusteeship.   Clear and convincing evidence will demonstrate that the Trusteeship was imposed and continued in violation of the ILA Constitution and the LMRDA.

93.     Mr. Daggett, however, achieved the objective that he sought from the outset of this matter.  On February 27, 2015, Mr. Daggett forwarded a copy of the Committee Report and Recommendations to Mr. Rowell, and informed him that the Report and Recommendations had been approved by the ILA Executive Council.  Mr. Daggett thereafter appointed Mr. Rowell as permanent Trustee over Local 333.

94.     Moreover, having failed in its first attempt to negotiate a CBA with the STA that deprives Local 333 of hard won gains of years past, the International is now continuing in its efforts to negotiate a contract with the STA without meaningful input from Local 333's officers or rank and file members.  On the contrary, the International has specifically selected individuals to participate in the contract negotiation efforts who oppose Mr. McKenzie, further demonstrating the International's desire to undermine the leadership of Local 333.

95.     The International is continuing to employ its tactics of intimidation in an effort to force the Local to approve a contract that is not in its best interests.  For example, at a membership meeting held on March 11, 2015, the membership was provided with only a single day's notice of the meeting.  Moreover, whenever a member spoke in opposition to the Trustee's position or to the contract being proposed, Mr. Rowell would attempt to intimidate the members, stating that the speaker was "hostile," or that the person was "trying to incite a riot."  When Mr. Givens was recognized to speak and expressed his views at the meeting, Mr. Rowell directly threatened Mr. Givens, stating that he had the MPA police in the rear of the meeting, and that Mr. Rowell was prepared to remove Mr. Givens and have him arrested if he spoke up.  These actions demonstrate clearly the true purpose for which Local 333 was placed in Trusteeship, which was to gain control over the Local for purposes of contract negotiations, and to maintain

that control by permanently sidelining the Local's democratically elected African American officers.

## COUNT I
### (VIOLATION OF THE LMRDA)

96.     Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 95 as if fully set forth herein.

97.     Defendant International is a labor organization in an industry affecting commerce within the meaning of the LMRDA.

98.     Defendant International, through the actions of its President, Defendant Daggett, and its Executive Council, comprised also of Defendants Holland, Knott, Owens, and Baker, established a Trusteeship over Plaintiff Local 333, and removed the Local's officers, including Plaintiffs McKenzie and Givens.

99.     The Trusteeship was not established by Defendants for any of the purposes for which trusteeships are permitted by section 302 of the LMRDA (29 U.S.C. § 462). There has never been any claim by Defendant International that Plaintiffs or any officer, agent, or employee of Plaintiff Local 333 (i) were guilty of corruption or financial malpractice which required correction; (ii) that the Trusteeship was necessary to assure the performance of any collective bargaining agreements or obligations of Local 333 as bargaining representative; or (iii) that the Trusteeship was otherwise necessary to carry out the legitimate objectives of Local 333.

100.    The stated purpose of the Trusteeship – to restore democratic procedures to Local 333 – is pretextual and is not the actual purpose of imposing the Trusteeship.

101.    Furthermore, the establishment and administration of the Trusteeship is contrary to the provisions of the ILA Constitution and Bylaws.

102.    Plaintiffs Local 333, McKenzie, and Givens were denied a fair hearing prior to the establishment of the Trusteeship.

103.    After seizing control of Plaintiff Local 333's offices, the International (through its agents) proceeded to negotiate with Defendant Employer, purportedly on behalf of Plaintiff Local 333, to amend the parties' collective bargaining agreement.   None of the members of Local 333's Wage Scale Committee, the persons elected by members of Local 333 and tasked with the responsibility of negotiations, participated in the negotiation of the proposed agreement.

104.    Even after the overwhelming rejection of the proposed new CBA by Local 333's membership, the Union Defendants have not terminated the Trusteeship over Local 333, but have continued to exercise control and supervision over the Local and have deprived it and its membership of all autonomy over their own affairs.

105.    Plaintiffs McKenzie and Givens were elected by the membership of Local 333 to the offices of President and Recording Secretary, respectively.   Both men have performed their duties as officers honestly and efficiently and in compliance with the applicable bylaws and constitutions.

106.    In contrast, the actions of Defendant ILA constitute a usurpation of the powers, rights, and privileges guaranteed to union officers like Mr. McKenzie and Mr. Givens and to union members like those of Local 333 by the constitution of the International, as well as by the LMRDA and other federal labor laws.

107.    Unless the Union Defendants are enjoined from continuing the imposition of this unlawful trusteeship and enjoined from further interference in the internal affairs of Local 333, Plaintiffs and all other members of Local 333 will be deprived not only of the right to be represented by persons of their own choosing, *i.e.*, Messrs. McKenzie and Givens, but they will

be subjected to the control of International leaders whose self-serving agenda will harm the members of Local 333.   In addition all of the New Member Plaintiffs will continue to be disenfranchised and deprived of all of the benefits of union representation.

108.   Plaintiffs believe that Defendant STA has participated in inducing or otherwise supporting Defendant International's imposition of the illegal Trusteeship on Plaintiff Local 333 for the purpose of acquiring apparent authority to negotiate and execute a new Collective Bargaining Agreement more favorable to the STA than its predecessor.

109.   The acts of Defendant ILA and the Defendants who are officers of the ILA, in imposing the illegal trusteeship over Plaintiff Local 333, and in unlawfully exercising control over the affairs of Local 333 as alleged in this action, have caused, and, if permitted to continue, will in the future also cause, irreparable harm and injury to Plaintiffs and to the membership of Plaintiff Local 333 whom Plaintiffs represent.

110.   Moreover, despite the Local membership's overwhelming rejection of the International's most recent contract proposal, Defendants are continuing to engage in further negotiations with the STA, and, unless prevented by this Court, they will carry out their plan and purpose, to the grave detriment of the employees of Defendant Employer represented by Plaintiff Local 333.

111.   Plaintiffs have no adequate remedy at law to prevent such injury, and therefore seek relief through the equitable powers of this court.

WHEREFORE, Plaintiffs Local 333, McKenzie, and Givens request:

1.   Judgment declaring that the Trusteeship over Plaintiff Local 333 imposed by Defendant International and the individual Union Defendants violates Title III of the Labor-Management Reporting and Disclosure Act (29 U.S.C.A. §§ 461 et seq.), that the actions of such

Defendants in suspending individual Plaintiffs McKenzie and Givens as officers of Plaintiff Local 333 also violates the LMRDA, and that Plaintiffs must be permitted to resume representation of the membership of Local 333 and continue representation free of any supervision and control on the part of the ILA or any of its agents or employees.

2.      Judgment permanently restraining and enjoining the Union Defendants from exercising any control or supervision over or otherwise interfering in the affairs of Plaintiff Local 333 under such invalid Trusteeship, and ordering such Defendants to immediately restore to Plaintiffs full possession and control of the offices, equipment, records, funds, and all other assets and property of Plaintiff Local 333;

3.      Judgment ordering the Union Defendants to reimburse Plaintiff Local 333 for all expenditures and disbursements made by them during the term of the Trusteeship for salaries and expenses of Defendants or any other officer or agent of Defendant International, and all other improper expenditures of Plaintiff Local 333's funds made by them;

4.      Judgment declaring that any agreements reached in negotiations between Defendant STA and Defendant International are null and void, as the International had no lawful authority to conduct such negotiations;

5.      Judgment awarding Plaintiffs their attorneys' fees and costs; and

6.      Such other and further relief as this Court may deem to be proper and appropriate.

## COUNT II
### (LMRA, SECTION 301 BREACH OF CONTRACT)

112.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 111 as if fully set forth herein.

113.    Article XIV, Section 2 of the ILA Constitution sets forth the criteria for admission to membership in the ILA.  Those criteria are intended to benefit "any worker who is employed

or seeks employment in a trade, industry or occupation within the jurisdiction of the I.L.A."  The Constitution further provides that all such individuals "shall be eligible to apply for membership and shall be admitted to membership without regard to race, age, sex, citizenship, or ethnic origin thirty (30) days after application unless just cause can be shown for rejection of the application."

114.    A union constitution is deemed a contract between a local union and the international with which it is affiliated.   The members of the local union are the direct beneficiaries of such a contract.

115.    New Member Plaintiffs are individuals who have been employed or have sought employment in the Port of Baltimore as longshoremen, a "trade, industry, or occupation" within the jurisdiction of the I.L.A.  Accordingly, the New Member Plaintiffs are intended beneficiaries of Article XIV, Section 2 of the ILA Constitution.

116.    New Member Plaintiffs all have satisfied the eligibility criteria for admission to membership into the ILA.  Each New Member Plaintiff has made proper application, waited 30 days without just cause being shown for denying membership, paid the appropriate Initiation Fee and First Quarter's Union Dues, received orientation and training that is required of new union members, and has been sworn into membership in Local 333.

117.    Despite the New Member Plaintiffs having satisfied all of the International Constitution's criteria for admission into the ILA, the International has refused to acknowledge that the New Member Plaintiffs are members of the ILA.  Instead, the International has expressly declared that the International rejects all New Member Plaintiffs as members of the ILA.

118.    Article XVII of the collective bargaining agreement between STA and Local 333 (the "CBA") provides for the processing of grievances by and between "an individual member or

members of the STA and the Union" in connection with "all issues involving the application and/or interpretation of the terms of this Agreement."

119.    The CBA does not provide a grievance procedure for individuals to grieve the International's refusal to acknowledge the individuals as members of the ILA.

120.    Moreover, for the reasons set forth below, any attempt by the New Member Plaintiffs to grieve the ILA's refusal to accept them as union members would be futile.

121.    On November 26, 2014, ILA President Harold Daggett suspended Local 333's officers and appointed ILA Vice President Wilbert Rowell as a temporary Trustee over Local 333.  On February 27, 2015, Mr. Daggett affirmed the appointment of Mr. Rowell as permanent Trustee over Local 333.

122.    In appointing Mr. Rowell as Trustee of Local 333, Mr. Daggett directed Mr. Rowell "to immediately take control of the affairs of Local 333."  Mr. Daggett further instructed that, "[d]uring the period of trusteeship all officers, officials and others operating under purported authority of ILA Local 333, are relieved of their respective duties."  Mr. Rowell brought back to assist him Executive Board Member Scott Cowan – the individual who had declared his intent to run against Mr. McKenzie in the next election – as well as Andrew Giles. Accordingly, in the event that the New Member Plaintiffs were to file internal grievances contesting the International's refusal to accept them as members of the ILA, it is Mr. Rowell who would have the authority to decide whether to process the grievance.

123.    Grieving this issue to Mr. Rowell would be futile.  Mr. Rowell is Mr. Daggett's hand-picked designee who, at Mr. Daggett's bidding, has consistently promoted the determination that the New Member Plaintiffs are rejected as members of the ILA.

124.     On November 24, 2014, as Chairman of the Discipline Committee that considered Mr. Barkhorn's initial complaint, Mr. Rowell concluded that the New Members "are not members of the ILA or ILA Local 333 since they have not fulfilled the conditions of membership by being approved by a vote of the majority of membership."

125.     On November 24, 2014, Mr. Rowell (upon information and belief, at the request of Mr. Daggett) issued charges against the Executive Board of Local 333, requesting Mr. Daggett to impose a Trusteeship over Local 333 because it had admitted the New Members into the ILA.

126.     On November 26, 2014, Mr. Daggett appointed Mr. Rowell as temporary Trustee over Local 333.

127.     On February 27, 2015, Mr. Daggett appointed Mr. Rowell as permanent Trustee over Local 333.

128.     On February 27, 2015, Mr. Rowell, acting in his capacity as Trustee of Local 333, wrote to each of the New Members and explained to them that "you are not a member of Local 333 and . . . you will receive a refund of any initiation fees or dues that you paid to Local 333."

129.     Accordingly, the submission of any grievance by any New Member Plaintiff to Local 333, which is controlled by Mr. Rowell as Trustee, would be futile.  The only remedy the New Member Plaintiffs have available to them is the bringing of this action.

130.     The International's refusal to accept the New Member Plaintiffs as members of the ILA and of Local 333 constitutes a violation of the ILA Constitution.

131.     The International's refusal to accept the New Member Plaintiffs as members of the ILA and of Local 333 constitutes a breach of contract that is actionable under Section 301 of the LMRA (29 U.S.C. § 185).

132.     The acts of the Union Defendants in refusing to acknowledge the New Member Plaintiffs' admission into the ILA and Local 333 in material breach of the ILA Constitution, have caused, and, if permitted to continue, will in the future continue to cause, irreparable harm and injury to the New Member Plaintiffs who are being, and will continue to be, deprived of the benefits of union membership until such breach can be remedied.

133.     New Member Plaintiffs have no adequate remedy at law to prevent such injury, and therefore seek intervention of this Court to enjoin the Union Defendants from interfering with the affairs of Local 333 and to order Defendant ILA to immediately grant admission to the ILA and Local 333 for the New Member Plaintiffs.

134.     Union Defendants have acted in bad faith and vexatiously in refusing to admit New Member Plaintiffs to the ILA and Local 333.

WHEREFORE, the New Member Plaintiffs demand:

1.     Judgment declaring that the Union Defendants' refusal to acknowledge the admission of the New Member Plaintiffs to membership in the ILA and Local 333 in violation of the ILA Constitution constitutes a breach of contract in violation of Section 301 of the Labor Management Relations Act, 1947, 29 U.S.C. § 185;

2.     Judgment permanently enjoining the Union Defendants from any further actions that would prevent the admission of the New Member Plaintiffs into full membership in the ILA and Local 333, and ordering the Union Defendants immediately to cease the refunding of the New Member Plaintiffs' Initiation Fees and Dues, and to accept from the New Member Plaintiffs the payment of all fees and dues required under the ILA Constitution and Local CBA  to be paid by union members;

3.   Judgment affirmatively enjoining the Union Defendants to promptly take such actions as will enable New Member Plaintiffs to undertake employment with employer members of the STA, including but not limited to processing and issuing, or causing to be issued, within thirty (30) days after entry of judgment, any and all identification cards or badges (including TWIC cards and MPA cards) necessary for the New Member Plaintiffs to access the Employer's terminals, and to be referred for and to perform work for the Employer; and

4.   Judgment awarding Plaintiffs the damages suffered as a result of the breach of the ILA Constitution, including, without limitation, back pay lost by current members of Local 333 as well as New Member Plaintiffs; expenditures from the Local 333 treasury by the ILA during the period of Trusteeship; and all attorneys' fees and other costs of this litigation; and

5.   Such other and further relief as this court may deem to be proper and appropriate.

**COUNT III**
**(VIOLATION OF JUDGE HARVEY ORDER AND CONSENT DECREE)**

135.   The allegations contained in paragraphs 1 through 134 are incorporated by reference as if full set forth herein.

136.   In 1970, litigation initiated by the Equal Employment Opportunity Commission ended with a Consent Decree issued by Judge Alexander Harvey in the case of *United States v. International Longshoremen's Assoc.*, Civil Action No.: 20688.  At the time of the litigation, ILA locals were divided by race with a white local and an African American local.  The Order sought to eliminate the unlawful, discriminatory structure of the ILA Locals.

137.   The broad order impacted various components of the labor-management structure in the Port, including the Seniority Board, an institution composed of management and union members who are involved in hearing grievances.  Issues of traditional seniority and opportunity for union members were also addressed.

138.    Significantly, the Court sought to address the broad stain of discrimination in the

Port, and it expressly retained jurisdiction over the entire matter, declaring that:

> This Court shall retain jurisdiction of this matter, with full power and authority to
> alter, amend, add to or delete any provision found not to be in the interest of
> justice and equity, or to issue any additional orders as becomes necessary to
> insure equal employment opportunities are provided to all member and non-
> member referral candidates, or applicants therefor without regards to race or
> color.

(Ex. 1, attached.)

139.    Racial discrimination, however, is an insidious disease.  Judge Harvey faced open

and obvious practices of racial discrimination – the existence of separate black and white local

unions – and mandated not only that the two locals be merged into one, but that objective criteria

like seniority be utilized to assure that career advancement on the docks would become

colorblind.

140.    Unfortunately, Judge Harvey's Decree did not eliminate racial discrimination

from the Ports of Baltimore.  It only sent it scurrying into the shadows.  Sadly, as witnessed by

the acts of the ILA and some members of Local 333 in the instant case, a pattern of racial

discrimination continues.  In a city which is approximately two-thirds African American, African

American leaders who seek to advance the interest of all members are ousted.  Leadership

positions in the Port and at the ILA are not given to persons of color.  Side deals are cut to

modify the collective bargaining agreement and disadvantage African Americans.  New

members are denied membership because of their race, though a flimsy excuse is used to seek to

cover the racism.  The list goes on – and it is a long list.

141.    Upon information and belief, the only way to stop the rampant discrimination

more than 40 years after the original decree, when racism is still alive and well, is for this Court

to use its equity powers to affirm the continuing vitality of the Judge Harvey Decree and to issue

such orders as the Court sees fit to fulfill Judge Harvey's vision of eradicating racial discrimination in the Port of Baltimore.

142.    In the decades since the issuance of the Judge Harvey Decree, the STA and the ILA have developed numerous tactics for unlawfully discriminating against African Americans in the workplace, restricting the advancement of black longshoremen, and promoting the advancement of their white counterparts.

143.    The tactics employed by the STA and ILA are designed to be undetectable at first glance to the outside observer.  However, they are easily proven by an examination of the hiring and promotion practices, the work assignment practices, and other practices and procedures (many of which have been imposed without ratification by Local 333), that have resulted in institutionalized racism.

144.    The discriminatory tactics utilized by the STA and ILA to deprive African Americans of equal employment opportunity at the Port of Baltimore include, but are not limited, to the following.

### Lack of Advancement in the ILA

145.    The ILA is a predominantly white organization that has failed to promote African Americans into International positions in any meaningful way.  Historically and presently, white men comprise the vast majority of leadership positions in the International, including the Executive Council, the ACD, and the SAGCD, as well as the vast majority of appointed Vice Presidents.  The same is true of the STA, which is comprised almost exclusively of white management, and whose supervisors working on the piers are almost entirely white men.

### Discriminatory Advancement into Premier Positions

146.     Judge Harvey recommended utilizing objective criteria, such as seniority, to determine advancement for workers at the Port.   The STA and ILA, however, have devised ingenious methods for bypassing the seniority system to favor whites over blacks.

147.     Among these methods, the STA has introduced various forms of skill testing as a means of inserting subjective criteria into an otherwise objective process.

148.     For example, the STA requires longshoremen first to become drivers (a low-level position) before they can receive the training necessary to operate a top loader (a premier position).   When the STA posts openings for driver positions, the longshoremen who are selected to apply for the posted driver positions are selected based on seniority – an objective criterion. This process creates the surface appearance of racial neutrality.

149.     However, the STA then "tests" the applicants for driver positions to determine whether they satisfy the skill criteria necessary to be selected as a driver.   It is in the use of these "tests" that the STA applies its discriminatory practices.   Despite repeated demands from Local 333, the STA has failed and refused to identify any objective criteria for these "tests."   Instead, longshoremen simply appear for driver skill testing and are put through a series of exercises unrelated to the actual performance of their duties.   Then, the STA decides who has "passed" and who has "failed" these "tests."   Only those who have "passed" may be selected to fill the posted driver positions – and only drivers qualify for further training as top loaders.

150.     The STA applies such tests discriminatorily.     More African American longshoreman apply for driver positions than white longshoremen.   Yet, despite the satisfactory performance on these tests of many African American employees, the STA utilizes arbitrary and subjective standards to intentionally "fail" a disproportionate number of African American applicants, and to "pass" a disproportionate number of white applicants, notwithstanding the fact

that African American longshoremen in Local 333, the largest bargaining unit in the Port, outnumber white longshoremen two to one.

151.    Often, the white applicants who are selected have far less seniority than their African American counterparts.  By being selected to become drivers (based on their race), these white employees with less seniority leapfrog past their African American counterparts with greater seniority to obtain premier jobs, such as operating top loaders.

152.    The STA utilizes similar "testing" techniques to award other premier positions. For example, the STA may post a job opening for a position in a gang, such as a lasher.  Rather than identify the objective criteria that an individual must satisfy in order demonstrate proficiency in lashing, the STA simply permits each gang to evaluate each applicant's lashing skills.  In addition to the impropriety of the STA seeking to acquit itself of the obligation to select employees to fill positions, the STA perpetuates discrimination by means of the use of subjective decision-making.  White gangs are enabled to choose white applicants with lower seniority over black applicants with greater seniority, without any accountability to anyone for their selection process.  This discriminatory practice contributes to the perpetuation of unequal employment opportunities for black members of Local 333.

153.    Similarly, the STA is contractually obligated to train Local 333 members for the skills they need to become gear men and mechanics, which are premier positions.  Instead, the STA simply posts job openings for gear man and mechanic positions without providing training in advance, and then tests applicants to determine which applicants will qualify for the open position.  Once again, the "test" criteria are not identified in advance, they are not objective, and they are utilized for the purpose of advancing white applicants over equally qualified African Americans, who often have greater seniority.  In the Port of Baltimore, there currently are 23

gear man and mechanic positions.  Whites have been selected for 22 of those positions.  There is only one African American gear man/mechanic, a man with 40 years of experience in the industry.

154.    The result of these practices is the overwhelmingly disproportionate selection of white longshoremen for premier positions over equally qualified African American longshoremen, who often have substantially greater seniority.  Foremen, gang carriers, crane operators, top loader operators, gear men, mechanics – all of these and other premier positions are awarded to whites disproportionately as a result of unlawful racial preference.

**Discriminatory Application of the Drug and Alcohol Policy**

155.    The Local CBA contains a Drug and Alcohol Policy (the "Policy") that is intended to eliminate the issue of employees working under the influence of drugs or alcohol.

156.    The STA, however, utilizes the policy in a racially discriminatory manner that is intended to, and effectively does, penalize African Americans.

157.    For example, the Policy permits the STA to perform random drug testing.  As written, the system for randomly selecting individuals for testing is supposed to be accomplished by placing all employees from all crafts and supervisors in a "computer pool" for selection.  This technique is designed to result in the random selection of employees for testing.

158.    In practice, however, the STA selects individuals for testing on anything but a random basis.  The STA discriminatorily selects a disproportionate number of African American employees for testing, and upon information and belief, the STA does not, in fact, follow the selection process set forth in the Policy.

159.    Furthermore, the STA does not comply with applicable regulations in its testing procedures, thus leading to the improper disqualification of a disproportionate number of black

employees. The STA does not comply, for example, with chain of custody requirements, monitoring rules, and environmental controls. The result is a disparate impact on African American employees.

160.    Moreover, the Policy itself is not being utilized for the purpose for which it first was adopted, which was to provide for the rehabilitation of employees who were determined to be using drugs and alcohol, and the return of these employees to the industry after receiving rehabilitative services. The Policy was never intended to be used punitively. Instead, the STA and the International jointly introduced seniority thresholds and a no-strike rule into the application of the Policy that are in conflict with the Master Collective Bargaining Agreement and which have had a discriminatory disparate impact on African American members of the ILA.

**The STA Discriminates Against African Americans in Issuing Discipline**

161.    The STA retains the right to discipline and discharge employees in accordance with the terms of the Local CBA.

162.    The vast majority of STA supervisors in the Port of Baltimore are white.

163.    The STA, through its supervisors, has undertaken a practice of targeting African American employees and threatening them with discipline for subjective offenses. For example, supervisors will accuse black operators of having a "near miss" in their operation of machinery in circumstances where the operation was safe and skilled. Supervisors will state that they are "cutting off" black employees because the supervisor "didn't see" them working, although the employee had been working diligently. Supervisors will state that they are "cutting off" black employees for taking too long in the bathroom when the employee took no longer than average.

164.    African Americans are targeted in grossly disproportionate numbers for such treatment.

165.    Moreover, the number of Employer trade practice committee grievances filed against ILA employees who are African American is grossly disproportionate to such grievances against white employees.

**By Requiring PIT Training to Use the Referral Center, the STA and ILA Discriminate Against African Americans**

166.    A small percentage of the jobs for which Local 333 members are referred to the STA, and for which the STA hires Local members, are jobs for which an individual must have Power and Industrial Truck training and certification under the Occupational Safety and Health Act ("PIT Training").

167.    Nevertheless, the STA and the ILA have conspired to impose a requirement on their referral and hiring practices that prohibits Local 333 from referring through its dispatch center any individual for employment unless that individual has PIT Training.  The STA and the ILA impose this prohibition on the referral for all posted jobs, including those jobs which do not require the qualified applicant to have PIT Training.

168.    This arbitrary requirement results in a bottleneck of employment referrals from Local 333 that substantially interferes with the ability of Local 333 members from being able to obtain work.

169.    The STA and the ILA exacerbate this bottleneck by further prohibiting Local 333 members from obtaining PIT Training from a third party, despite the fact that such third-party training is permitted by OSHA regulations and by the terms of a Settlement Agreement dated July 14, 2000 to which OSHA, the ILA, and employers in the longshoring and marine terminal operations industries are parties.

170.    Despite the STA and the ILA refusing to permit Local 333 members without PIT Training to be dispatched for work through the dispatch center, individuals without PIT Training

who merely report for work directly at the terminal are being hired for work by the STA "off the pier."

171.    This nonsensical collusion between the STA and the ILA has the intent and impact of disparate treatment and disparate impact discrimination against the African American members of Local 333.

**The STA is Colluding with the MPA to Permit Individuals without Clearance to Work at the Expense of Local 333 Members**

172.    Many of the job positions for which the STA hires workers are located at secure terminals that require security clearance to perform such work.  It is the responsibility of the Maryland Port Authority ("MPA") to assure that only individuals with proper clearance perform such work.

173.    Nevertheless, the MPA, at the request and direction of the STA, has colluded to permit many white individuals to perform work at these secure terminals without having the proper and necessary clearance credentials.

174.    This practice has the intent and impact of causing disparate treatment and disparate impact discrimination against the African American members of Local 333.

**Additional Discriminatory Practices**

175.    In addition to the foregoing, additional categories of discriminatory treatment and their practices exist and represent an endemic problem at the Port of Baltimore.

WHEREFORE, all Plaintiffs request that the Court

1.    Declare unequivocally that the Judge Harvey Decree remains in effect and this Court holds continuing jurisdiction to see that the original Consent Order is heeded, and to

render additional judgments and issue additional orders as this Court sees fit to accomplish this purpose;

2.      Hold in contempt any Defendant who can be shown to have violated either the letter or the spirit of the decree;

3.      Issue an injunction barring further discriminatory acts or omissions by Defendants or any of them, in violation of the spirit or the letter of the decree or in violation of any federal law barring discrimination, and affirmatively requiring Defendants to implement employment practices that do not discriminate against Plaintiffs or any African American members of Local 333 and which operate based on objective, rather than subjective, factors;

4.      Award Plaintiffs damages for all harm suffered as a result of any violation of the Judge Harvey Decree;

5.      Award Plaintiffs their attorneys' fees and other litigation costs; and

6.      Award such other relief as this Court deems just and proper.

Respectfully submitted,

_____/s/_____

Bruce M. Luchansky (Fed. Bar No. 08439)
    lucky@luchanskylaw.com
LUCHANSKY LAW
606 Bosley Avenue, Suite 3B
Towson, Maryland 21204
Telephone: (410) 522-1020
Fax: (410) 522-1021

_____/s/_____

Kenneth A. Sprang, Esq. (Fed. Bar No. 28154)
    ksprang@wibclaw.com
Washington International Business Counsel, LLP
2 Wisconsin Circle, Suite 700
Chevy Chase, MD  20815
Direct Dial: (202) 499-6941
Fax: (202) 403-3644
*Attorneys for Plaintiffs*